**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS, INDIANA**

| | |
|---|---|
| TRACIE BEAMON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )CIVIL ACTION NO.: 1:17-cv-00880 RLY-MJD |
| | ) |
| OPTIONS TREATMENT FACILITY, | ) |
| | ) |
| Defendant. | ) |

**PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S**
**MOTION FOR SUMMARY JUDGMENT**

**INTRODUCTION**

Tracie Beamon began working for Defendant in September 2010. She performed her job very well. Her last two performance evaluations were rated exceptional, the highest rating given by Defendant. Nevertheless, Ms. Beamon was terminated in August 2016. The reason given for Ms. Beamon's termination was that she allegedly violated Defendant's abuse and neglect policy by allegedly accusing two (2) residents of engaging in inappropriate activity and threatening to restrain them. Ms. Beamon did not abuse any patients. However, there are three (3) similarly situated Caucasian employees, who are substantially younger than Ms. Beamon, who did in fact abuse Defendant's patients physically, verbally and otherwise but they were not terminated for violating Defendant's abuse and neglect policy, and in most instances, they were not even disciplined.

Defendant has violated Section 1981 and Title VII and the Age Discrimination in Employment Act (ADEA) by terminating Ms. Beamon due to her race and age. As a result, Defendant's motion must be denied.

1

I.      STATEMENT OF MATERIAL FACTS IN DISPUTE

A.      Defendant's Policies and Procedures

1.      Defendant has a policy prohibiting patient abuse and neglect. It prohibits any mistreatment or abuse of any patient physically, verbally, psychologically or sexually.   Meyer Dep. pp. 15-16, Dep. Ex. 6.

2.      Examples of patient abuse are striking a patient, using excessive force in restraining a patient, rough handling of the patient, teasing taunting or ridiculing a patient, speaking inappropriately with a patient and threatening a patient.  Meyer Dep. Ex. 6.

3.      Defendant has a zero tolerance policy for patient abuse and neglect and finding of patient abuse and neglect will result in immediate termination. Id; Meyer Dep. pp. 13-14, Ex. 9, p.7.

4.      Any employee who witnesses patient abuse or neglect must report it to the Risk Manager, Department Head or Supervisor.  Id.

5.      Employees must observe certain boundary restrictions. Staff members, students, interns and contract staff  must have no sexual contact, familiarity, sexual joking with patients or their families and staff must observe appropriate personal space.  Meyer Dep. Ex. 4.

6.      According to Defendant's policy all direct care staff must be twenty-one (21) years old or older.  MHT's are direct care staff.  Meyer Dep. p. 13:3-12, Ex. 8, p. 5.

7.      Staff members, students, etc., may not be alone in a patient's room with the door closed. Meyer Dep. Ex. 19.

8.      All boundary violations must be reported immediately through the chain of command. Meyer Dep. Ex. 19.

9.      Mental Health Technicians (MHT's) must complete situation and/or incident reports

2

when observing unusual circumstances.  Beamon Aff. ¶ 5.

10.   Robin Meyer the Human Resource Director testified that he is made aware of situation reports containing abuse and neglect of a patient involving employees.  Meyer Dep. p. 67:3-22.

11.   Defendant's Human Resource Department consisted of the Human Resource Director and his assistant while Ms. Beamon worked for Defendant.  Beamon Aff. ¶ 6.

**B.     Defendant's Relevant Employees**

12.   Alan Fischer was Defendant's Chief Executive Officer in 2015 through my tenure with Defendant. Beamon Aff. ¶ 7.

13.    Robin Meyer was Defendant's Human Resource Director from January 2015 to the present.  Meyer Dep. pp. 7:18 - 8:8.

14.    Dennis Greer was Defendant's Program Director while Ms. Beamon worked for Defendant. Beamon Aff. ¶ 9.

15.   Geral Williams was the Milieu Manager from 2011 to October 2015.  Geral Williams Aff. ¶ 5.

16.   Diana Williams was Tracie Beamon's supervisor from May 2015 to November 2015. Diana Williams Aff. ¶¶ 4-6.

17.   Annette Schriver was the unit nurse on the unit in which Ms. Beamon worked in 2015 and 2016.  Beamon Aff. ¶ 12.

18.    Defendant's chain of command while Tracie Beamon worked for Defendant was as follows: MHT-Supervisor-Program Director-Human Resource Director-Chief Executive Officer. The unit nurse was not an MHT's direct supervisor but they had authority over the MHT's.  Beamon Aff. ¶ 13; Meyer Dep. p. 23:16-25.

**C.     Tracie Beamon's Race, Age and Job Performance with Defendant**

19.   Tracie Beamon is African-American.  Beamon Aff. ¶ 2.

20.    Tracie Beamon's date of birth is April 13, 1965, and she is currently 53 years old. Beamon Aff. ¶ 3.

21.    Tracie Beamon began working for Defendant on September 7, 2010, as a MHT and remained an MHT throughout the entirety of her employment with Defendant.  Beamon Aff. ¶ 4.

22.   Defendants performed annual evaluations.  Its' performance evaluation rating system was as follows: 0-105 improvement required; 105-152 minimum experience; 153-200 meets standard; 201-209 exceeds standard and 209-300 exceptional;.  Meyer Dep. Ex. 1, p.3

23.    Tracie Beamon's 2015 performance rating was 274.25 - exceptional.  Meyer Dep. p. 17, Ex. 1, p.3.

24.    Tracie Beamon's 2014 performance rating was 210 - exceptional.  Meyer Dep. Ex. 2, p. 3.

25.    Tracie Beamons' 2013 performance rating was 198.80 - meets standard.  Meyer Dep. Ex. 3, p. 3.

26.    Tracie Beamon's 2012 performance rating was 228 - exceptional.  Meyer Dep. Ex. 4, p. 3.

27.    Tracie Beamon's 2011 performance rating was 200 - meets standard.  Meyer Dep. Ex. 5, p. 3.

28.    Tracie Beamon's 2010 performance rating was 197.25 - meets standard.  Meyer Dep. Ex. 7, p. 3.

### D.      Tracie Beamon's Termination

29.    Tracie Beamon was terminated on August 3, 2016.  Meyer Dep. p. 24, Ex. 10.

30.    The reason given for Tracie Beamon's termination was abuse and neglect of a patient. She allegedly abused and neglected a patient by threatening to put a patient in a hold and accused a patient of acting inappropriately in a sexual manner with another patient.  Meyer Dep. pp. 22-23, Ex. 10.

31.      Robin Meyer made the decision to terminate Tracie Beamon and Alan Fischer, Defendant's CEO was consulted.  Defendant's Response to Plaintiff's First Set of Interrogatories No. 4.

32.    Mr. Meyer did not personally witness the alleged conduct that lead to Ms. Beamon's termination; it was reported to him in an incident report prepared by Annette Shriver a Licensed Practical Nurse (LPN) who was a supervisor of the unit on which Ms. Beamon worked and she had authority over Ms. Beamon and other MHT's.  Meyer Dep. p. 23.

33.    Ms. Beamon did not threaten to put a patient in a hold nor did she accuse patients of engaging in sexual activity.  On the day in question, after her break,  Ms. Beamon was making her usual "rounds" to check on the patients.  She walked into a patient's room and saw the patient sitting on her bed and another patient standing close to the patient who was sitting on her bed.  She informed the patients they were not to be alone in a room together.  The patients left the room and Ms. Beamon went to the nurses office and told Annette Shriver, the nurse on the unit, that two patients were in the room alone.  Ms. Shriver immediately stated they were not in the room that long. Ms. Beamon responded it doesn't matter they are not to be alone in a room for any time. Particularly, those two patients because they both have histories of sexually acting out (SAO)

behaviors. All of this communication took place in the nurse's office. Ms. Beamon left the nurse's office and returned to the patient's room. The patient was sitting next to her bed with a cover on her. Ms. Beamon asked her to get in the bed so she would know she was safe. The patient did get in the bed but shortly thereafter started banging her head. Ms. Beamon call for staff assistance and when staff arrived Ms. Beamon went back to the nurse's office and informed her what had just happened. After Ms Beamon informed the nurse, Ms. Beamon came out of the office. The staff member was talking to the patient outside of the patient's room. Ms. Shriver came to the door of the office and had the patient come into the office. Beamon Aff. ¶¶ 14-29.

### E.    Randy Murphy

34.    Randy Murphy is a Caucasian male. Beamon Aff. ¶ 30.

35.    Randy Murphy is 38 and his date of birth is October 9, 1979, Defs. Response to Plaintiff's First Set of Interrogatories - No. 14.

36.    Randy Murphy worked for Defendant from June 22, 2015, throughout the period Ms. Beamon worked for Defendant. Meyer Dep. p. 56, Ex. 32.

37.    Randy Murphy voluntarily resigned his position. Meyer Dep. p. 56.

38.    Randy Murphy was a Mental Health Technician. Meyer Dep. pp. 56:4-57:3.

### F.    Randy Murphy's Misconduct

39.    On January 26, 2016, Randy Murphy shoved a patient in the back to the floor during gym time. Meyer Dep. p. 37, Exs. 32 and 33.

40.    Mr. Murphy was suspended for two (2) days without pay. Meyer Dep. p. 60:17-25, Ex. 32.

41.    Robin Meyer signed the counseling form suspending Randy Murphy for shoving a

patient in the back. Meyer Dep. p. 61:4-13.

42.    A witness provided a statement regarding Randy Murphy shoving a patient in the back

knocking him to the floor and the statement does not state the patient did not complain. Meyer Dep.

p. 62:7-10, Ex. 33.

43.    On January 28, 2016, Randy Murphy was observed hitting a patient in the back. Meyer

Dep. pp. 62:11-63:4, Ex. 33.

44.    The statement regarding Randy Murphy hitting a patient in the back was on the same

statement regarding Randy Murphy shoving a patient in the back knocking him to the floor. Meyer

Dep. Ex. 33.

45.    Robin Meyer reviewed the statement regarding Randy Murphy hitting a patient in the

back. Meyer Dep. pp. 63:1-65:1.

46.    Robin Meyer does not recall Randy Murphy being disciplined or investigated for hitting

a patient in the back. Meyer Dep. p. 63:5-7.

47.    Robin Meyer does not recall an investigation regarding the statement which stated that

Randy Murphy was hitting a patient in the back. Meyer Dep. p. 63:19-22, p. 65:2-5.

48.    In 2015 sometime between May and November Randy Murphy bent a patient's arm

backward causing the patient harm. Diana Williams, his supervisor, told him twice to stop bending

the patient's arm backward but he refused to stop until she demanded that he stop a third time. The

patient appeared to be in pain. Williams Dep. pp. 20:12-23, 29:17-24.

49.    Annette Shriver administered medicine to the patient, in the form of a shot, to calm the

patient down immediately after Randy stopped. Williams Dep. pp. 51:6-10, 52:4-25.

50.    Diana Williams told Annette Shriver about Randy Murphy bending the patient's arm

backward.  Williams Dep. p. 51:1-5.

51.    After everything calmed down Diana Williams called Randy Murphy to the office to inform him she was going to write him up and let Dennis Greer, Program Manager, know what he did.  Murphy got verbally combative.  He stood up over her in an attempt to intimidate her.  He got really loud.  Williams Dep. pp. 20:24-21:6.

52.    Diana Williams reported Randy Murphy's aggressive behavior toward her to Robin Meyer.  Williams Dep. pp. 21:6-8, 54:1-55:7.

53.    Diana Williams reported Randy Murphy's conduct - bending the patient's arm backward and his aggressive conduct toward her to Dennis Greer, her supervisor.  Williams Dep. pp. 28:9-18, 53:9-12.

54.    She also drafted a situation report regarding Randy Murphy's conduct toward the patient and toward her and gave that to Dennis Greer, her supervisor.  Williams Dep. pp. 28:12-18, 28:25-29:5.

55.    Randy Murphy also verbally abused patients by calling them dumb and retarded.  Diana Williams reported this conduct to her immediate supervisor, Geral Williams.  Williams Dep. p. 26:3-7.

56.    Diana Williams reported Randy Murphy's verbal abuse to Geral Williams her immediate supervisor 5 or 6 times.  Williams Dep. p. 26:14-22.

57.    Geral Williams, a supervisor, completed written reports of Randy Murphy's verbal abuse of patients and submitted them to Robin Meyer, Human Resources and Defendant's CEO.  Geral Williams Aff. ¶ 29; Geral Williams Second Aff. ¶ 5.

**F.    Sophia Heady (Kathleen)**

8

58.   Sophia Heady is a Caucasian female.  Diana Williams Aff. ¶ 7.

59.    Sophia Heady is currently 21 years old, she was born June 7, 1996.  Meyer Dep.
pp.39:18-40:19, Ex. 18 - Int. No. 14.

60.    Sophia Heady was a Mental Health Technician for Defendant.  DianaWilliams Aff.
¶ 7; Meyer Dep. p. 50.

61.    Sophia Heady was terminated on January 19, 2016, for inappropriate interaction with
a patient, she gave a former patient a ride in her personal vehicle.  Meyer Dep. p. 55, Exs. 26.

62.   Sophia Kathleen and Sophia Heady are the same person.  Williams Dep. p. 34.

**G.     Sophia Heady's Misconduct**

63.    Sophia Heady was under 21 years of age when she worked for Defendant as an MHT.
It was a violation of Defendant's policy to employ MHT's under 21.  Robin Meyer and Defendant's
CEO knew Sophia was under 21 but continued to employer her in violation of Defendant's policy.
Meyer Dep. pp. 52:13-53:24.

64.    In 2015 Diana Williams witnessed Sophia Heady fighting with a resident holding the
resident's head in a headlock.  Williams Dep. pp. 34:22-35:3.

65.    Ms. Williams wrote a situation report about Sophia fighting and holding a patient in
a headlock and she gave the report to Geral Williams, her immediate supervisor.  Williams Dep. pp.
36:12 and 13, 36:24-37:13.

66.   Diana Williams also observed Sophia Heady call patients dumb and retarded.  Williams
Dep. p. 34:24 and 25; Diana Williams Aff. ¶ 8.

67.   She reported Sophia's conduct of calling residents dumb and retarded to her immediate
supervisor, Geral Williams.  Williams Dep. 35:19-25; Diana Williams Aff. ¶ 9.

68. Diana Williams also heard from other staff that Sophia Heady was verbally abusing patients by cussing at them, calling them dumb and retarded, and that Sophia had pulled a patients' hair. Williams Dep. p. 35:7-16.

69. In 2015 in June or July Sophia Heady was on top of a patient pulling the patient's hair and attempting to "pin" the patient's elbow to the ground. The patients began to fight back before the incident could be stopped. The conduct was reported to Robin Meyer, Human Resources and Defendant's CEO. Geral Williams Aff. ¶¶ 11 and 12; Geral Williams Second Aff. ¶ 5.

70. Sophia Heady's conduct was in no way proper physical restraint. Geral Williams Aff. ¶¶ 15 and 16.

71. Geral Williams also witnessed Sophia Heady on three or more occasions in 2015 verbally abuse residents by cussing at them and calling them dumb, stupid and retarded and other humiliating and derogatory terms. Geral Williams Aff. ¶ 17.

72. Each time Geral Williams heard Sophia Heady verbally abuse residents she reported it to Robin Meyer, Human Resources and Defendant's Chief Executive Officer. Geral Williams Aff. ¶ 18; Geral Williams Second Aff. ¶ 5.

73. Sophia Heady was not disciplined for any of the above conduct. Defendant's Response to Plaintiff's First Set of Interrogatories - No. 10; Meyer Dep. Ex. 18 - Int. No. 11; Geral Williams Aff. ¶ 14.

74. Diana Williams noticed that a resident had bruises on her arm. Sophia Heady had been personally responsible for the patient. Diana Williams reported the bruises to Annette Shriver. Sophia Heady was removed from the unit temporarily. Williams Dep. pp. 47:24-50:10.

**H.    Zach Ramsey**

75.   Zach Ramsey is a Caucasian male.  Geral Williams Aff. ¶ 20.

76.   Zach Ramsey was born on October 28, 1985.  Meyer Dep. p.34, Ex. 16 - Int. 14.

77.   Zach Ramsey was employed by Defendant as a Mental Health Techinician. Beamon Aff. ¶ 31.

78.   He was employed by Defendant as an MHT in 2015 and 2016.  Beamon Aff. ¶ 31.

**I.    Zach Ramsey's Misconduct**

79.   Geral Williams walked into a patient's room and Zach Ramsey was in the room alone with the patient watching her undress.  Geral Williams Aff. ¶ 21.

80.   Geral Williams reported Zach Ramsey's conduct to Robin Meyer, Human Resources and Defendant's Chief Executive Officer.  Geral Williams Aff. ¶ 22; Geral Williams Second Aff. ¶ 5.

81.   Geral Williams heard Zach Ramsey tell a patient she was "sexy".  Ms. Williams confronted Mr. Ramsey and reported his conduct to Robin Meyer, Human Resources and Defendant's Chief Executive Officer.  Geral Williams Aff. ¶ 23; Geral Williams Second Aff. ¶ 5.

82.   Zach Ramsey was not disciplined for any of the above conduct. Meyer Dep. Ex. 16 - Int. No. 10; Geral Williams Aff. ¶¶ 22 and 23.

83.   On several occasions staff reported to Geral Williams misconduct by Zach Ramsey. For example, on one occasion a staff member reported to Ms. Williams that Zach Ramsey had escorted a fully dressed resident to the emergency room, but upon their return the resident was only clothed in a hospital gown.  All of these reports were forwarded on to Robin Meyer, Human Resources and Defendant's Chief Executive Officer.  Geral Williams Aff. ¶ 24; Geral Williams Second Aff. ¶ 5.

84.   Staff members, on several occasions, asked Geral Williams why wasn't anything being done about Zach's misconduct.  She directed the staff to Human Resources.  Geral Williams Aff. ¶ 25.

85.   Geral Williams began working for Defendant as a Mental Health Technicians in 2005. She became the Milieu Manager in 2011 and remained in that position until she resigned in October of 2015.  Geral Williams returned to work for Defendant in May 2017 as a scheduler.  Geral Williams Second Aff. ¶¶ 2-4 and 6.

86.   Near the end of 2017, an individual who identified herself as Defendant's attorney contacted Geral Williams about the affidavit she had signed on behalf of Tracie Beamon.  Geral Williams Second Aff. ¶ 8.

87.   Defendant's attorney asked Geral Williamswhether the affidavit was accurate and she told her yes.  Geral Williams Second Aff. ¶ 9.

88.   Defendant's attorney asked Geral Williams when she stated in the affidavit that she reported conduct to Human Resources did Ms. Williams report that conduct to Robin Meyer, she told her yes.  Geral Williams Second Aff. ¶ 10.

89.   In February 2018 Geral Williams was given a subpoena by Defendant to appear for a deposition in the Tracie Beamon case on February 20, 2017.  Geral Williams Second Aff. ¶ 11.

90.   On February 19, 2018, Geral Williams received another call from an individual who identified himself as Defendant's attorney.  Geral Williams Second Aff. ¶ 12.

91.   The attorney asked Geral Williams the same questions as the other attorney had asked her previously and she answered the same.  Geral Williams Second Aff. ¶ 13.

92.   The next day shortly before Geral Williams was scheduled to appear for her deposition,

she was called by an individual who identified himself as Defendant's attorney and told she did not have to appear for the deposition.  Geral Williams Second Aff. ¶ 14.

93.    On February 27, 2018, Geral Williams was told by Robin Meyer she was being suspended without pay because of a letter written by a resident to another resident that mentioned her name.  General Williams Second Aff. ¶ 16.

94.    Geral Williams was never shown a copy of the letter.   Geral Williams Second Aff. ¶ 16.

95.    After nine (9) days of being suspended Geral Williams was allowed to return to work. Geral Williams Second Aff. ¶ 17.

96.    When Geral Willams returned to work she was told by Robin Meyer, in a meeting that included the CEO and another supervisor, that she was suspended about management style.   Geral Williams then was suspended for two (2) more days without pay.  Geral Williams Second Aff. ¶ 18.

97.    After the two additional days of suspension Geral Williams was allowed to return to work and was forced to sign a performance improvement plan (PIP).  She was told if she did not sign the PIP she would be fired.  Geral Williams Second Aff. ¶ 19.

98.    Geral Williams was told by Robin Meyer she was being given the PIP because she challenged the therapist regarding their treatment plan.  Geral Williams Second Aff. ¶ 20.

99.    Shortly thereafter staff members told Geral Williams that they were being ordered to Robin Meyer's office and he was asking them questions about her. Geral Williams Second Aff. ¶ 21.

100.   Geral Williams was extremely stressed by what was going on.  She could not handle the pressure.  She felt she had no choice but to resign to maintain her mental well being.  Geral

Williams Second Aff. ¶ 22.

**J.    Objections and Disputes to Defendant's Alleged Statement of Material Facts Not in Dispute**

101.    On page 4 of Defendant's Statements of Material Facts Not in Dispute (SMF)

Defendant states:

In addition to its commitment to providing safe and effective treatment options and residential programs for its patients, Options is committed to providing equal employment opportunities for its employees and has in place anti-discrimination policies and a process for employees to raise concerns about any perceived unfair treatment.

Defendant's alleged fact is an argumentative and conclusory statement to the extent it argues

about its' commitment to providing equal employment opportunities.  Defendant terminated Ms.

Beamon, an African-American employee, for an alleged violation of its' abuse and neglect policy

but it did not terminate Caucasian employees who repeatedly violated its' abuse and neglect policy.

Meyer Dep. Ex. 10; See Plaintiff's Material Facts in Dispute 38, 42, 47, 54, 63, 64, 67, 77 and 79.

102.    On page 5 of Defendant's (SMF) Defendant states:

Plaintiff's employment was relatively uneventful until August of 2016, when Charge Nurse Annette Schriver, reported that Plaintiff had falsely accused two female adolescent patients of acting out sexually, and had done so in a way that allowed other patients to hear the allegations.  Ms. Schriver also reported that Plaintiff had threatened to put one of the residents in a restraint.  As a result of Plaintiff's allegations and threats, one of the patients was embarrassed and began to self-harm by cutting her wrists, again according to Ms. Schriver.

She did not falsely accuse nor threaten any patient.  Beamon Aff. ¶¶ 14-29. Shriver was

aware of Caucasian employees engaging in abusive conduct but they did not get fired.  Williams

Dep. pp. 20, 29, 51 and 52.

103.    On page 5 of Defendant's SMF Defendant states:

The patient confirmed that Plaintiff said what and acted in the way exactly as Ms. Schriver

reported.

Ms. Beamon was an exceptional employee. Her last two evaluations rated her as exceptional. Meyer Dep. Exs. 1 and 2. She did not falsely accuse nor threaten any patient. Beamon Aff. ¶ 14. Shriver was aware of Caucasian employees engaging in abusive conduct but they did not get fired. Williams Dep. pp. 20, 29, 51 and 52.

104.    On page 6 of Defendant's SMF Defendant states:

Ultimately, Mr. Meyer concluded that he did not believe Plaintiff's denial; instead, he honestly believed that the reported conduct was true.

Defendant's claim of "honest belief" is a conclusory argumentative statement. The Court is under no obligation to accept Defendant's claim of "honest belief". See Flores v. Preferred Technical Group 182 F.3d 512 (7th Cir. 1999); Dey v. Colt Const. & Dev. Co. 28 F.3d 1446, 1460-61 (7th Cir. 1994); Collier v. Budd Co. 66 F.3d 886, 893 (7th Cir. 1995).

105.    On page 6 of Defendant's SMF Defendant states:

Having made that determination, Mr. Meyer made the decision to terminate Plaintiff's employment based upon his honest and good faith belief that her conduct and commentary constituted the terminable offense of abuse and neglect. Options also reported Plaintiff to Child Protective Services.

Defendant terminated Ms. Beamon, an African-American employee, for an alleged violation of its' abuse and neglect policy but it did not terminate Caucasian employees who repeatedly violated Defendant's abuse and neglect policy. If Meyer honestly believed Ms. Beamon's conduct merited termination, he certainly would have terminated Murphy, Ramsey and Heady for their abusive conduct. Meyer Dep. Ex. 10; See Plaintiff's Material Facts in Dispute 38, 42, 47, 54, 63, 64, 67, 77 and 79.

106.    On page 6 of Defendant's SMF Defendant states:

Options' decision to terminate Plaintiff and to report her had absolutely nothing to do with her age or her race.

Defendant terminated Ms. Beamon, a n African-American employee, for an alleged violation of its' abuse and neglect policy but it did not terminate substantially younger Caucasian employees who repeatedly violated its' abuse and neglect policy. Geral Williams and Diana Williams have personal knowledge of Murphy, Heady and Ramsey's abusive conduct. They reported the abusive conduct to Robin Meyer and other management employees and drafted situation reports. Id. Age and race were clearly factors. Meyer Dep. Ex. 10; See Plaintiff's Material Facts in Dispute 38, 42, 47, 54, 63, 64, 67, 77 and 79.

107.   On page 6 of Defendant's SMF Defendant states:

Plaintiff claims that three white, under forty employees - Sophia Heady, Zach Ramsey and Randy Murphy - engaged in "abuse and neglect" and were not terminated though she admits that she had absolutely no personal knowledge that any of them actually did so.

Defendant terminated Ms. Beamon, an African-American employee, for an alleged violation of its' abuse and neglect policy but it did not terminate Caucasian employees who repeatedly violated its' abuse and neglect policy. Geral Williams and Diana Williams have personal knoweldge of Murphy, Heady and Ramsey's abusive conduct. They reported the abusive conduct to Robin Meyer and other management employees and drafted situated reports. Id.   Meyer Dep. Ex. 10; See Plaintiff's Material Facts in Dispute 38, 42, 47, 54, 63, 64, 67, 77 and 79.

108.   On page 6 of Defendant's SMF Defendant states:

In truth, Mr. Meyer - the decision-maker for Plaintiff's termination - had no knowledge of any alleged abuse and neglect by any of the alleged comparators.

This is simply a false statement. Geral Williams reported Murphy's, Ramsey's Heady's abusive conduct directly to Robin Meyer. Geral Williams Aff. ¶¶12, 18, 22, 23, 24, 25 and 29; Geral

16

Williams Second Aff. ¶ 5.   Robin Meyer actually disciplined Randy Murphy when he shoved the patient in back, knocking him to the floor.  Meyer Dep. Exs. 32 and 33.  Robin Meyer is also aware of the fact that Randy Murphy was hitting a patient in the back because the witness reported the incident in the same statement where she reported Murphy shoving the patient in the back.  Meyer Dep. pp. 63:1-65:1, Ex. 33.   Further, Geral Williams and Diana Williams drafted and submitted situation reports regarding Murphy's, Ramsey's and Heady's abusive conduct.  Geral Williams Aff. ¶ 29 and Williams Dep. pp. 28, 36 and 37.  Robin Meyer testified that he reviewed situation reports regarding abusive conduct involving employers.  Meyer Dep. p. 67:3-22.

109.   On pages 6 and 7 of Defendant's SMF Defendant states:

He is aware, however, that Ms. Heady violated Options' policy by driving a former patient home from the facility and he terminated her for it.  Ms. Heady, who held the same position as Plaintiff (Mental Health Technician) is white and under the age of forty.

Ms. Heady had engaged in repeated instances of abusive conduct for which she had not been terminated nor disciplined at all prior to her termination.  Geral Williams Aff. ¶¶ 10, 11, 14 and 17; Diana Williams Aff. ¶¶ 8 and 9.   Further, Heady was under 21 when she worked as a MHT for Defendant.  Meyer Dep. Ex. 18 - Int. No. 14. Defendant's policy prohibits anyone working under the age of 21 as an MHT, but Robin Meyer and the CEO allowed Heady to work as an MHT in violation of Defendant's policy.  Meyer Dep. pp. 52 and 53, Ex. 8, p. 5.

110.   On page 7 of Defendant's SMF Defendant states:

Mr. Meyer has terminated other employees - black and white, over the age of forty and under - for a myriad of policy violations, including Options zero tolerance for abuse and neglect.

Defendant terminated Ms. Beamon, an African-American employee, for an alleged violation of its' abuse and neglect policy but it did not terminate substantially younger Caucasian employees

17

who repeatedly violated its' abuse and neglect policy.  Meyer Dep. Ex. 10; See Plaintiff's Material

Facts in Dispute 38, 42, 47, 54, 63, 64, 67, 77 and 79.  The one employee Defendant cites as an

example of Robin Meyer terminating a younger Caucasian employee is Sophia Heady.  However,

Sophia prior to her termination had been allowed to engage in repeated instances of abusive conduct

and allowed to work under the age of 21 in violation of Defendant's policy.  Geral Williams Aff. ¶¶

10, 11, 14 and 17; Diana Williams Aff. ¶¶ 8 and 9; Meyer Dep. pp. 52-53, Ex. 8 p. 5.

     111.  On page 6 of Defendant's SMF Defendant states:

     Options likewise has disciplined employees for less serious incidents involving patients, such as when Mr. Murphy was playing soccer with a resident and pushed him and when Mr. Ramsey was sleeping during his shift, neither of which rose to the level of abuse and neglect.

     Mr. Murphy shoved a patient in the back knocking him to the floor.  In the same statement

that reported Mr. Murphy shoving a patient to the floor, it also reported that Mr. Murphy was hitting

another patient in the back two (2) days later.  However, Mr. Murphy was only suspended two (2)

days not terminated.  Meyer Dep. Exs. 32 and 33.  Mr. Murphy was not disciplined for hitting the

patient in the back nor any of his other abusive conduct.  Meyer Dep. Ex. 16, Int. No. 10.   Mr.

Murphy engaged in despicable conduct which violated Defendant's abuse and neglect policy but he

was not terminated or disciplined in any way for much of it.  Meyer Dep. Ex. 16, Int. No. 10, Exs.

32 and 33; Geral Williams Aff. ¶ 29; Diana Williams ¶¶ 12, 13 and 14.

## II.    SUMMARY JUDGMENT STANDARD

     In order for the Plaintiff to successfully defeat the Defendant's Motion for Summary

Judgment, she must establish that there are genuine issues of material fact.  As the United States

Supreme Court explained in <u>Anderson v. Liberty Lobby</u>, 477 U.S. 242 (1986):

     "it is true that the issue of material fact required by Rule 56(c) to be

present to entitle a party to proceed to trial is not required to be
resolved conclusively in favor of the party asserting its existence;
rather, all that is required is that sufficient evidence supporting the
claimed factual dispute be shown to require a jury or judge to resolve
the parties' differing versions of the truth at trial."  Citing First
National Bank of Arizona v. Cities Service Co., 391 U.S. 253, 88 S.
Ct. 1575, 20 L.Ed.2d 569 (1968)

Although the court must consider the substantive law of employment discrimination and the

burdens of proof applicable under the law, the court must consider the evidence in the light most

favorable to the plaintiff.  Mechnig v. Sears, Roebuck and Co. 864 F.2d 1359 (7th Cir. 1988).  "In

fact the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn

in his favor."  Anderson, 477 U.S. at 255.

Therefore, the Plaintiff in response to a motion for summary judgment is not required to

prove all issues upon which he has the burden of proof.  Summary judgment is used to determine

"whether there is the need for a trial - whether, in other words, there are any genuine factual issues

that properly can be resolved only by a finder of fact because they may reasonably be resolved in

favor of either party."  Anderson, 477 U.S. at 250.

## III.    LEGAL STANDARD FOR RACE AND AGE DISCRIMINATION.

McDonnell Douglas Corporation v. Green, 411 U.S. 792 established the landmark tripartite

analysis for discrimination cases.  Plaintiff must establish a prima facie case of discrimination,

Defendant then must articulate a legitimate non-discriminatory reason for its action, finally Plaintiff

must prove that Defendant's legitimate non-discriminatory reason is pretext.

In order to establish a prima facie case of race discrimination  Plaintiff must prove the

following by a preponderance of the evidence: (1) he is a member of a protected class, (2) he was

meeting Defendant's legitimate expectation, (3) he suffered an adverse employment action, and (4)

similarly situated employees outside of his protected class were treated mor favorably.  Coleman v.

Donahoe 667 F.3d 835, 845 (7th Cir. 2012).   In order to prove a prima facie case of age

discrimination Plaintiff must prove by a preponderance of the evidence (1) she was over the age of

40; (2) her job performance met Defendant's legitimate expectation (3) she suffered adverse

employment action; and (4) Defendant treated similarly situated employees who are substantially

younger at least 10 years younger.  Filar v. Board of Education of the City of Chicago 525 F.3d 1054

(7th Cir. 2008).  Substantially younger for purposes of the ADFA means 10 years or more.  Runyon

v. Applied Extensions Techs, Inc. 619 F.3d 735, 740 (7th Cir. 2010)

For both race and age once Plaintiff establishes a prima facie case and Defendant articulates

a legitimate reason for its adverse action, the burden then shifts to Plaintiff to prove the proffered

reason is pretext. Id. Once pretext is proven, the trier of fact is free to infer discrimination. Reeves

v. Sanderson Plumbing Products, Inc., 120 S. Ct. 2097, 530 U.S. 133 (2000); St. Mary Honor Center

v. Hicks, 113 S.Ct. 2742, 2745 (1993).

The Seventh Circuit has stated that a Plaintiff can prove pretext several different ways.

Plaintiff can prove pretext by showing that similarly situated employees outside of the protected

class who engaged in similar conduct were treated more favorably.  Coleman v. Donahoe 667 F.3d

835, 845 (7th Cir. 2012). Plaintiff can prove pretext by showing that the Defendant's proffered reason

is unworthy of credence.   Gordon v. United Airlines, Incorporated 246 F.3d 878; Johnson v.

Nordstrom, Inc. 260 F.3d 727 (7th Cir.2001).  Plaintiff may demonstrate that the Defendant's reasons

are unworthy of credence and therefore pretext by evidence showing at least one of the following:

(1) Defendant's explanation has no basis in fact, (2) the explanation was not the real reason, and (3)

the reason was insufficient to warrant the action taken.  Id.  Finally, Plaintiff can prove pretext by

showing that Defendant has shifted or given inconsistent reasons for Plaintiff's termination. Appelbaum v. Milwaukee Metro. Sewage Dist., 340 F.3d 573, 579 (7th Cir. 2003) (citing Zaccagnini, 338 F.3d at 678; Schuster, 327 F.3d at 577; Lawson v. CSX Transp., Inc., 245 F.3d 916, 931-32 & n.13 (7th Cir. 2001); Castleman v. Acme Boot Co., 959 F.2d 1417, 1422 (7th Cir. 1992)).

## ARGUMENT

## V. PLAINTIFF HAS PRESENTED SUFFICIENT FACTS TO PROVE A PRIMA FACIE CASE OF RACE AND AGE DISCRIMINATION REGARDING HER TERMINATION

Defendant does not dispute that Ms. Beamon is in a protected class for both race and age discrimination nor that she suffered a material adverse employment decision, elements one (1) and three (3) respectively. Ms. Beamon is African-American and over forty (40) and she was terminated.

### A. Ms. Beamon was meeting Defendant's Legitimate Expectation.

Ms. Beamon was meeting Defendant's legitimate expectation. All of Ms. Beamon's evaluations were meeting expectation or exceptional. In fact, her last two annual evaluations for 2014 and 2015, she was rated exceptional, the highest rating an employee could obtain.

Even if the Court does not conclude that the above shows that Ms. Beamon was meeting Defendant's legitimate expectation, it still must find in Ms. Beamon's favor regarding this element. The Seventh Circuit has held that when an employer applies its' legitimate expectation or policies in a discriminatory fashion the second and fourth elements of the prima facie case merge, and the analysis goes directly to pretext. Ekhativ v. Dunkin Donuts, Inc. 493 F.3d 827, 831 (7th Cir. 2007); Peel v. Country Mutual Insurance Co. 288 F. 3d 319, 329 (7th Cir. 2002); Curry v. Menards, Inc. 270 F.3d 473 (7th Cir. 2001). In Curry v. Menard Defendants argued that Plaintiff was not meeting its legitimate expectation because Plaintiff had three (3) violations under its progressive discipline

policy.   Plaintiff argued, however, she was treated more harshly than whites who violated Defendant's policies.  Curry v. Menard 270 F.3d 473, 477-478 (7th Cir. 2001).  The Court stated that Defendant's argument was more appropriately considered during the Court's analysis of pretext because it made little sense to discuss whether the employee was meeting Defendant's legitimate expectation when the issue is whether Plaintiff was singled out for discipline based on a prohibited factor.  Id.  The Court can assume Plaintiff is meeting Defendant's legitimate expectation when that element dovetails with the issue of pretexts.  Vak-karma v. Swedish Convenant Hosp. 190 F.3d 799, 807 (7th Cir. 1999).

In our case Ms. Beamon was terminated allegedly for abuse and neglect of a patient. However, Randy Murphy, Sophia Heady and Zach Ramsey, similarly situated, substantially younger (all over 10 years younger) Caucasian employees, violated Defendant's abuse and neglect policy repeatedly but they were not treated as harshly as Ms. Beamon.  Defendant's abuse and neglect policy prohibits any patient from being mistreated or abused physically, verbally, psychologically or sexually while in Defendant's care.  Defendant's policy regarding abuse and neglect states the following conduct constitutes abuse and neglect:  striking a patient, using excessive force in restraining a patient, rough handling of a patient, teasing taunting and ridiculing a patient, speaking inappropriately with a patient and threatening a patient.

Randy Murphy shoved a patient in the back knocking him to the floor.  That is striking and rough handling of a patient, a clear violation of Defendant's abuse and neglect policy.  Murphy was given a two day suspension but not terminated.  Two days after shoving a patient to the floor Murphy was observed hitting a patient in the back.  That is obviously striking a patient, a clear violation of Defendant's abuse and neglect policy.  Murphy was not disciplined.  Murphy, while restraining a

patient was bending the patient's arm backward causing the patient harm.  He was told three (3) times by his supervisor to release the patient before he complied.  This is excessive force while restraining a patient.  Another clear violation of Defendant's abuse and neglect policy.  Murphy was not disciplined.  Murphy called patients dumb and retarded.  This is teasing, taunting, ridiculing and speaking inappropriately to patients.  Clear violation of Defendant's abuse and neglect policy.  Murphy was not disciplined.  Despite all the above violations, Murphy was not terminated.

Sophia Heady was observed fighting with a patient holding the patient's head in a headlock.  On another occasion she was observed on top of a patient pulling the patient's hair and trying to "pin" the patient's elbow to the floor.  All of which is rough handling and using excessive force while restraining a patient.  Clear violations of Defendant's abuse and neglect policy.  Heady was not terminated nor disciplined at all.  Heady verbally abused patients by cussing at them and calling them dumb, stupid, retarded and other derogatory terms.  This is teasing, taunting, ridiculing and speaking inappropriately to patients.  Clear violations of Defendant's abuse and neglect policy.  Sophia Heady was not terminated or disciplined for any of the abuse violations.  Further, Sophia Heady was nineteen (19) years old when she worked for Defendant as an MHT.  Defendant's policy prohibits anyone from working as an MHT under the age of twenty-one (21).  Sophia Heady was allowed to continue to work as an MHT despite her age.

Zach Ramsey was caught alone in a patient's room while she was undressing.  On another occasion he was alone in a patient's room sitting on the patient's bed hugging her.  He was overheard calling a patient "sexy".  Keep in mind the patients are adolescent children.  It is a violation of Defendant's abuse and neglect policy to mistreat a patient sexually or to speak inappropriately to patients.  Defendant's Code of Ethics also prohibits sexual contact, familiarity, staff from being

23

alone in a room with a patient.  Ramsey violated all of the those policies.  However, he was not terminated nor disciplined in anyway for it.

Murphy, Ramsey and Heady were simply unfit to care for Defendant's patients.  In fact, there conduct should have been reported to Child Protective Services by Defendant.  However, they were not terminated for their abusive conduct nor reported to CPS.  Ms. Beamon was treated much more harshly than substantially younger Caucasian employees who engaged in similar but worse conduct than what she was accused of.  Defendant applied its' policies in a discriminatory fashion.  Thus, the Court must assume that Ms. Beamon was meeting Defendant's legitimate expectations and this element merges with pretext.

**B.      Plaintiff has Presented Sufficient Facts to Prove that Similarly Situated Caucasian Employees who are Substantially Younger than Plaintiff were Treated More Favorably.**

The similarly situated inquiry for comparators using the indirect method of proof is flexible, factual and require common sense.  Coleman v. Donahoe 677 F.3d 835, 841 (7th Cir. 2012).  It asks whether there are enough common features between the individuals to make a meaningful comparison. Id. To show that another employee is similarly situated Ms. Beamon  must show that there is someone who is directly comparable to her in all material respects.  Coleman at 846.  A Plaintiff need not show complete identity with a comparator, she simply must show substantial similarity.  Eaton v. Department of Corrections 657 F.3d 551 (7th Cir. 2011); Seredinji v. Beverly Healthcare, LLC 656 F.3d 540, 551 (7th Cir. 2011).  Similar conduct does not necessarily mean the same conduct, it means conduct of comparable seriousness.  Coleman at 850-851.  In disciplinary cases in order to prove that employees are similarly situated a Plaintiff must show that the two employees dealt with the same supervisor, were subject to the same standards and had engaged in

similar conduct. <u>Webber v. Universities Research Association</u> 621 F.3d 589, (7th Cir. 2010); Rabidue at 617; <u>Adams v. Wal-Mart</u>. Although Courts have used the term supervisor in determining whether employees are similarly situated, the term does not necessarily mean an employees immediate supervisor.   Coleman at 847-848.   The Courts are actually referring to the decision-maker or decisionmakers regarding the adverse action taken against the employee. Id.  Whether that is the employee's immediate supervisor or someone else.  Id.

Randy Murphy, Zach Ramsey and Sophia Heady are similarly situated to Tracie Beamon. Robin Meyer is the decision maker in Ms. Beamon's termination.  He also had authority over Murphy, Ramsey and Heady.  In fact, he was the one who gave Randy Murphy a two (2) day suspension for shoving a patient to the floor, but chose not to discipline him for other abusive conduct.  He also disciplined Zach Ramsey for poor attendance but chose not to discipline him for his abusive conduct.  He terminated Sophia Heady for having a previous patient in her car, but chose not to discipline her other abusive conduct.  Beamon, Murphy, Ramsey and Heady dealt with the same decision maker.

Beamon, Murphy, Ramsey and Heady were all MHT's and were under the same rules and regulations.  They were all subject to Defendant's abuse and neglect policy.

Murphy, Ramsey and Heady engaged in similar but worse conduct than what Ms. Beamon was accused of.  Murphy, Ramsey and Heady engaged in conduct prohibited by Defendant's abuse and neglect policy on several occasions.  See Section V A.

Beamon, Murphy, Ramsey and Heady are similarly situated.  They dealt with the same decision maker.  They worked  under the same rules and regulations.  Murphy, Ramsey and Heady engaged in similar but worse conduct than that which Ms. Beamon was accused; they repeatedly

violated Defendant's abuse and neglect policy.  They were not terminated for their violations.

## VI.  PLAINTIFF HAS PRESENTED SUFFICIENT FACTS TO PROVE THE REASON GIVEN FOR HER TERMINATION IS PRETEXT

The Seventh Circuit has stated that a Plaintiff can prove pretext several different ways. Plaintiff can prove pretext by showing that similarly situated employees outside of her protected class who engaged in similar conduct were treated more favorably.  Coleman v. Donahoe 667 F.3d 835, 845 (7th Cir. 2012). Plaintiff can prove pretext by showing that the Defendant's proffered reason is unworthy of credence.  Gordon v. United Airlines, Incorporated 246 F.3d 878; Johnson v. Nordstrom, Inc. 260 F.3d 727 (7th Cir.2001).  Plaintiff may demonstrate that the Defendant's reasons are unworthy of credence and therefore pretext by evidence showing at least one of the following: (1) Defendant's explanation has no basis in fact, (2) the explanation was not the real reason, and (3) the reason was insufficient to warrant the action taken.  Id.

In our case Defendant claims it terminated Ms. Beamon because she allegedly violated Defendant's abuse and neglect policy by falsely accusing two residents of engaging in inappropriate conduct in the presence of others and threatening to put the residents in a hold.  Ms. Beamon, as stated above, did not engage in the conduct she is accused of.  Nevertheless, we have shown that at least three (3) similarly situated, substantially younger Caucasian employees did, in fact, violate Defendant's abuse and neglect policy repeatedly but they were not terminated. Murphy, Ramsey and Heady are similarly situated to Ms. Beamon.  In fact, they engaged in conduct that is significantly worse than what Ms. Beamon is accused of.  Murphy, Ramsey and Heady engaged in despicable conduct that not only constituted abuse and neglect of a patient but probably constitutes criminal activity.  They verbally abused patients  by calling them dumb, retarded and other derogatory terms. They physically abused patients by shoving them to the floor, bend their arms backward, pulling their

hair and fighting them.  They sexually abused them by watching a patient undress in her room, or hugging a patient alone in her room or calling a patient sexy.  However, these Caucasian substantially younger employees who engaged in this despicable conduct were not terminated nor even disciplined for most of it.

Further, if the reason given for Ms. Beamon's termination was the real reason, then it certainly would have terminated Murphy, Ramsey and Heady for their violations of Defendant's abuse and neglect policy.  Obviously, if Defendant's reason is not the real reason it is pretext.

Defendant claims either that the above conduct is not abuse and neglect or that it was not aware of it.  We have shown in Section V A, the conduct that Murphy, Ramsey and Heady have engaged in is abuse and neglect.  Further, Robin Meyer and others in authority were aware of the conduct and did not terminate them.  Robin Meyer disciplined Randy Murphy for shoving a patient to the floor.  Obviously he knew of the conduct.  Further, in the same statement that reported the patient being shoved to the floor also, reported that Randy Murphy was hitting a patient in the back two (2) days after he shoved the patient to the floor.  Robin Meyer indicated he read that statement.  However, Murphy was not disciplined for the hitting incident.  Geral Williams has testified that she reported several incidents of abuse and neglect by Murphy, Ramsey and Heady directly to Robin Meyer and Defendant's CEO.  She also submitted situation reports to Robin Meyer.  Lastly, Diane Williams testified she reported to Robin Meyer that Randy Murphy verbally abused and attempted to intimidate her regarding her attempt to discipline Murphy regarding his abuse of a patient.  Further, Annette Shriver, the same nurse who accused Ms. Beamon of abuse and neglect, had to give medicine to a patient after the patient was abused by Murphy.  Diane Williams also prepared a situation report of the incident.  Thus, Robin Meyer and others in positions of authority were aware

of Murphy's, Ramsey's and Heady's conduct despite their claim of no knowledge. Their false denial of knowledge is further evidence of pretext.

Plaintiff has presented substantial evidence to call into question Defendant's alleged honest belief. Simply because a Defendant claims "honest belief" does not mean the Court must accept the Defendant's word. The Seventh Circuit has stated:

> "Indeed, we have stated that a "determination of whether a belief is honest is often conflated with analysis of reasonbleness," *Flores v. Preferred Technical Group*, 182 F.3d 512, (7th Cir. 1999); "the more objectively reasonable a belief is, the more likely it will seem that the belief was honestly held," id. Our cases therefore have acknowledged that we need not take an employer at its word. For instance, we have held that when an employee provides "[a] detailed refutation of events which underlie the employer's negative performance assessment," the employee demonstrates "that the employer may not have honestly relied on the identified deficiencies in making its decision." *Dey v. Colt Constr. & Dev. Co.,* 28 F.3d 1446, 1460-61 (7th Cir. 1994). Furthermore, "[i]f the employee offers specific evidence from which the finder of fact may reasonably infer that the proffered reasons do not represent the truth, the case then turns on the credibility of the witnesses." *Collier v. Budd Co.,* 66 F.3d 886, 893 (7th Cir. 1995). In such circumstances, the employee creates "a factual issue as to whether the employer's explanation is credible or merely a pretext for discrimination." *Dey,* 28 F.ed at 1461. "[W]hen the sincerity of an employer's asserted reasons for discharging an employee is cast into doubt, a fact finder may reasonably infer that unlawful discrimination was the true motivation ..." Id.

We have presented specific evidence that shows that Defendant's given reason for terminating Ms. Beamon could not be the real reason in light of its' treatment of Murphy, Ramsey and Heady. The fact Defendant chose not to terminate Murphy, Ramsey and Heady for their abusive conduct, nor even to discipline them for most of it, shows that the reason it has given for Ms. Beamon's termination is not the real reason. Thus, Defendant's reason is pretext.

**VII.    ADDITIONAL EVIDENCE IN RESPONSE TO CLAIMS MADE BY DEFENDANT IN ITS' BRIEF IN SUPPORT OF ITS' MOTION**

Defendant states three additional facts to support its' claim that Defendant did not discriminate against Ms. Beamon due to her race or age: (1) it terminated Sophia Heady, it disciplined Randy Murphy and it had African Americans and people over 40.   Actually when you examine these facts and the circumstances surrounding them, they provide further evidence of race and age discrimination.

Sophia Heady should never have been hired as an MHT.  She was only 19 years old. Defendant's policy prohibits it from employing MHT's under the age of 21.  Both Robin Meyer and Defendant's CEO allowed Heady to work as an MHT knowing she was under 21.  Further, Robin Meyer and Defendant's CEO allowed Heady to continue to work for Defendant despite her repeated violations of Defendant's abuse and neglect policy.  Thus, the evidence shows that Ms. Heady's termination was long overdue and that she was treated much more favorably than Ms. Beamon.

Randy Murphy was given only a two day suspension for shoving a patient in the back, knocking him to the floor.  Keep in mind the patient and all of Defendant's patient's are adolescent children.  He was not disciplined for any of the other abusive conduct he engaged in. Again, the fact that he was given only a two day suspension for clearly abusive conduct and not terminated or disciplined for other instances of clearly abusive conduct supports Ms. Beamon's claim of race and age discrimination.

The fact Defendant may have hired an African-American employee after it terminated Ms. Beamon is not evidence in favor of Defendant's defense.  The question in this case is whether an African-American employee was treated less favorably than substantially younger

Caucasian employees due to race and age. The evidence we have presented clearly shows she was. In fact, Defendant may have hired African-American employees after it terminated Ms. Beamon, to cover up the fact it discriminated against the one they just fired.

Lastly, Defendant retaliated against Geral Williams because she testified on behalf of Ms. Beamon. Geral Williams had been a good employee for Defendant. She resigned her position to seek other opportunities in 2015 but was thought highly enough of that she was re-hired in 2017. After Defendant became aware that Geral Williams had submitted an affidavit on behalf of Ms. Beamon and would not change her testimony Defendant suspended her, put her on a performance improvement plan and began to question other employees about Ms. Williams. The situation got so bad for Ms. Williams she felt she had no choice but to resign her position to maintain her mental well-being.

## CONCLUSION

The Defendant's Motion for Summary Judgment rests on its proffered reason for Defendant's action. The law is clear that such a motion cannot be successful if Plaintiff presents evidence that creates a "reasonable inference that the employers proffered explanation is unworthy of credence." Sorba v. PA Drilling Co., 821 F.2d, 200, 202 (3rd Cir. 1987). Though Plaintiff has the burden of proof on the issue of pretext, at this stage it is sufficient to merely cast doubt on the veracity of the employer's stated reasons. Seitz v. Peat Marwick Mann and Co., 704 F.Supp. 157, 161 (N.D. Ill. 1989); Stumpf v Thomas and Skinner, Inc., 770 F.2d 93, 98 (7th Cir. 1985). Plaintiff has gone well beyond simply casting doubt on Defendant's proffered reason.

Plaintiff submits that upon viewing all the facts presented, in the light most favorable to him, there exists genuine issues of material fact, therefore Defendant's Motion For Summary Judgment

should be denied.

Respectfully submitted,

  s/Gregory A. Stowers
GREGORY A. STOWERS, #13784-49

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been forwarded via electronic filing, this

26th   day of April, 2018, to; Laurie E. Martin, Allyson E. Emley, HOOVER HULL TURNER

LLP, 111 Monument Circle, Suite 4400, P. O. Box 44989, Indianapolis, IN 46244-0989 and

Mark Peters, Loren Lancaster, WALLER LANDSDEN DORTCH & DAVIS LLP, 511 Union

Street, Suite 2700, Nashville, TN   37219.

  s/Gregory A. Stowers
GREGORY A. STOWERS, #13784-49

Gregory A. Stowers
**STOWERS & WEDDLE P.C.**
626 N. Illinois Street
Suite 201
Indianapolis, IN 46204
(317) 636-6320